## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARC G. FEDERIGHI, individually and on behalf of all those similarly situated, | |
| *Plaintiff*, | |
| v. | |
| BANK OF NOVA SCOTIA, NEW YORK AGENCY; BMO CAPITAL MARKETS CORP.; BNP PARIBAS SECURITIES CORP.; BARCLAYS CAPITAL INC.; CANTOR FITZGERALD & CO.; CITIGROUP GLOBAL MARKETS INC.; COMMERZ MARKETS LLC; CREDIT SUISSE SECURITIES (USA) LLC; DAIWA CAPITAL MARKETS AMERICA INC.; DEUTSCHE BANK SECURITIES INC.; GOLDMAN, SACHS & CO.; HSBC SECURITIES (USA) INC.; JEFFERIES LLC; J.P. MORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MIZUHO SECURITIES USA INC.; MORGAN STANLEY & CO. LLC; NOMURA SECURITIES INTERNATIONAL, INC.; RBC CAPITAL MARKETS, LLC; RBS SECURITIES INC.; SG AMERICAS SECURITIES, LLC; TD SECURITIES (USA) LLC; and UBS SECURITIES LLC, | Civil Action No. 15cv05843<br><br><br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |
| *Defendants*. | |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................. 1

II.    JURISDICTION AND VENUE .......................................................................... 3

III.   PARTIES .............................................................................................................. 4

    A.   Plaintiff .................................................................................................... 4

    B.   Defendants ............................................................................................... 4

IV.    CLASS ALLEGATIONS .................................................................................. 11

V.     FACTUAL ALLEGATIONS ............................................................................ 13

    A.   Treasuries Constitute a Worldwide Financial Benchmark and Are Critical to the Fed's Implementation of U.S. Monetary Policy. ................................. 13

        1.   Announcement of the auction. ................................................... 13

        2.   Bidding .......................................................................................... 14

        3.   Issuance ......................................................................................... 14

        4.   Buying and Selling That Takes Place Around the Auction .......... 14

    B.   Primary Dealers Are Entrusted to Help Assist the Fed Implement U.S. Monetary Policy and Are Thus Obligated to Adhere to the Highest Ethical Standards at Each and Every Stage of the When-Issued Treasury Auction Process ................. 15

    C.   The Critical Role Primary Dealers Play in Treasuries Price-Setting ................... 17

    D.   Defendants Abused Their Position as Primary Dealers By Conspiring to Fix and Otherwise Manipulate the Price of Treasuries Defendants Sold in the When-Issued Market. ........................................................................................ 17

VI.    FRAUDULENT CONCEALMENT .................................................................. 19

VII.   CLAIMS FOR RELIEF .................................................................................... 20

COUNT ONE:    VIOLATION OF SECTION 1 OF THE SHERMAN ACT .......................... 20

COUNT TWO:    MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT ......................................................................................... 22

COUNT THREE: EMPLOYMENT OF MANIPULATIVE OR DECEPTIVE DEVICE OR CONTRIVANCE iN VIOLATION OF THE COMMODITY EXCHANGE ACT, INCLUDING CFTC RULE 180.1 ........................................ 23

COUNT FOUR:   PRINCIPAL-AGENT LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT ........................................................ 24

COUNT FIVE:    AIDING AND ABETTING MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT ............................................... 24

VIII.  PRAYER FOR RELIEF .................................................................................... 24

IX.    JURY DEMAND ............................................................................................... 25

Plaintiff, MARC G. FEDERIGHI ("Plaintiff"), files this civil action under Section 1 of the Sherman Act, Section 4 of the Clayton Act, Section 22 of Commodity Exchange Act, and Rule 23 of the Federal Rules of Civil Procedure, for treble damages, costs of suit, and other relief as may be just and proper, on behalf of itself and a class of those similarly situated ("Class") (defined below) against defendants BANK OF NOVA SCOTIA ("BNS"), NEW YORK AGENCY ("Agency"), BMO CAPITAL MARKETS CORP. ("BMO"), BNP PARIBAS SECURITIES CORP. ("BNP"), BARCLAYS CAPITAL INC. ("Barclays"), CANTOR FITZGERALD & CO. ("Cantor"), CITIGROUP GLOBAL MARKETS INC. ("Citigroup"), COMMERZ MARKETS LLC ("Commerz"), CREDIT SUISSE SECURITIES (USA) LLC ("Credit Suisse"), DAIWA CAPITAL MARKETS AMERICA INC. ("Daiwa"), DEUTSCHE BANK SECURITIES INC. ("Deutsche Bank"), GOLDMAN, SACHS & CO., HSBC SECURITIES (USA) INC. ("Goldman"), JEFFERIES LLC ("Jefferies"), J.P. MORGAN SECURITIES LLC ("JPMorgan"), MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED ("Merrill"), MIZUHO SECURITIES USA INC. ("Mizuho"), MORGAN STANLEY & CO. LLC ("Morgan Stanley"), NOMURA SECURITIES INTERNATIONAL, INC. ("Nomura"), RBC CAPITAL MARKETS, LLC ("RBC"), RBS SECURITIES INC. ("RBS"), SG AMERICAS SECURITIES, LLC ("SG"), TD SECURITIES (USA) LLC ("TD"), and UBS SECURITIES LLC ("UBS") (collectively, "Defendants") for Defendants' conspiracy to fix and otherwise manipulate the U.S. Treasury bills, notes, and bonds ("Treasuries") markets. Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges:

## I. INTRODUCTION

1. This antitrust and commodities class action concerns Defendants' conspiracy to fix and manipulate the markets for U.S. Treasuries and related derivative financial products (*i.e.*,

"Treasury-Predicated Instruments"), including Treasury-predicated futures and options traded on the Chicago Mercantile Exchange ("CME"). Treasuries – debt instruments issued by the U.S. Treasury Department ("Treasury Department") to help finance operation of the U.S. government – and Treasury-Predicated Instruments are traded all over the world and serve as a global benchmark for a variety of financial arrangements. Interest rates and loan agreements, for example, are often explicitly tied to Treasuries valuations. It is because Treasuries are so widely integrated into so many different kinds of financial arrangements that the economic health of the U.S. – and indeed the world's economy – is highly correlated with the Treasuries.

2.     Each and every Defendant in this case is or was a Primary Dealer of Treasuries. Primary Dealers are responsible for purchasing the overwhelming majority of Treasuries offered for sale by the Treasury Department at designated Treasuries Auctions throughout the year. Among other things, these Primary Dealers are entrusted to help the U.S. Federal Reserve (the "Fed") institute U.S. monetary policy through their participation in these Treasuries Auctions and to effectuate all related transactions in a manner that not only exemplifies the highest ethical standards but also "reinforces overall market integrity."[1]

3.     These Primary Dealer-Defendants abused their positions of trust to their own ends by conspiring with each other to fix and otherwise manipulate the when-issued market and related auction of U.S. Treasuries, at both the point of purchase and the point of sale. At both transaction points Defendants relied on – as confirmed by recent reports[2] – electronic chatrooms, instant messaging, and other difficult-to-track-and-trace electronic and telephonic methods to exchange confidential and competitively sensitive information to coordinate customer orders and

---

[1] Treasury Market Practices Group ("TMPG"), *Best Practices for Treasury, Agency Debt, and Agency Mortgage-Backed Securities Markets* (Sept. 14, 2010), http://www.ny.frb.org/tmpg/bestpractice_09142010.pdf.
[2] Alecandra Scaggs, Daniel Kruger, and Keri Geiger, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk Is a Good Place to Start*, Bloomberg (June 24, 2015), http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes-treasuries.

trading strategies in order to artificially:  (i) *depress* the price of the Treasuries they acquired through the Auction; and (ii) *inflate* the price of those Treasuries when Defendants sold them in the attendant when-issued market, which were transactions involving (and injuring) Plaintiff and the Class.  Further, Defendants' conduct had the intent and effect of also artificially *inflating* the price of related Treasury-Predicated Instruments in transactions involving (and injuring) Plaintiffs and the Class.

4.      Recent reports indicate that the U.S. Department of Justice ("DOJ") – which has recently uncovered a range of similarly anti-competitive and manipulative conduct in other financial markets that has resulted in substantial fines and guilty pleas – is investigating this conduct and has already contacted at least three banks.

5.      Plaintiff brings this action for claims arising under the federal antitrust and commodities laws to recover damages and other relief for the substantial injuries it and others similarly situated have sustained as a result of Defendants' unlawful conduct.

## II.    JURISDICTION AND VENUE

6.      This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 4 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 22 of the Commodity Exchange Act, 7 U.S.C. §25, and seeks to recover threefold damages, interest, costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiff and the Class (defined below) resulting from Defendants' conspiracy to fix and otherwise manipulate the price of when-issued Treasuries in the Secondary When-Issued Treasuries Market and related Treasuries Instruments. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. § 15.

7.      Venue is proper in this district pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period (defined below), each Defendant resided, transacted business, was found, or had agents in this district, and a substantial portion of

the alleged activity affected interstate trade and commerce discussed below has been carried out in this district.

8.      Defendants' conduct, as described in this complaint, was within the flow of, was intended to have a substantial effect on, and did have a substantial effect on, the interstate commerce of the United States, including in this district.

9.      This Court has personal jurisdiction over each Defendant. Each Defendant has, throughout the United States and including in this district, transacted business, maintained substantial contacts, or committed overt acts in furtherance of their conspiracy. Defendants' conspiracy has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

## III.   PARTIES

### A.   Plaintiff

10.     Plaintiff Marc G. Federighi ("Plaintiff") is an individual residing in Barrington Hills, Illinois.  During the Class Period, Mr. Federighi purchased, directly from one or more of the Defendants, Treasuries and/or Treasury-Predicated Instruments during the Class Period.  As a direct and proximate result of Defendants' collusion, manipulative conduct, and unlawful acts, Mr. Federighi was injured in his business or property.

### B.   Defendants

11.     Defendant Bank of Nova Scotia, New York Agency ("BNS") is the agency office of the Bank of Nova Scotia licensed by the New York State Department of Financial Services with its principal place of business located at 250 Vesey Street, New York, New York 10080. During the Class Period, BNS was a registered Primary Dealer of U.S. Treasury Securities with

the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[3]

12.     Defendant BMO Capital Markets Corp. ("BMO"), is a Delaware corporation with its principal place of business located at 3 Times Square, 28th Floor, New York, NY 10036. During the Class Period, BMO was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[4]

13.     Defendant BNP Paribas Securities Corp. ("BNP"), is a Delaware corporation with its principal place of business located at 787 Seventh Avenue, New York, NY 10019.  During the Class Period, BNP was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[5]

14.     Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation with its principal place of business located at 745 Seventh Avenue, New York, NY 10019.  During the Class Period, BNS was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[6]

15.     Defendant Cantor Fitzgerald & Co. ("Cantor") is an affiliate of Cantor Fitzgerald, L.P., a Delaware limited partnership, with its principal place of business located at 499 Park Avenue, New York, NY 10022.  During the Class Period, Cantor was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in

---

[3] *See* http://newyorkfed.org/markets/pridealers_current.html.
[4] *Id.*
[5] *Id.*
[6] *Id.*

5

U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments and/or members of the Class.[7]

16.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a New York corporation with its principal place of business located at 388 Greenwich Street, New York, New York 10013.   During the Class Period, Citigroup was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[8]

17.     Commerz Markets LLC ("Commerz") is a Delaware limited liability company with its principal place of business located at 2 World Financial Center, New York, NY 10281. Commerz was formerly known as Dresdner Kleinwort Securities LLC.   As a result of the acquisition of Dresdner Kleinwort Securities LLC by Commerzbank AG, the name was changed in April 2010.  During the Class Period, Commerz's predecessor-in-interest Dresdner Kleinwort Securities LLC was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.

18.     Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability company with its principal place of business located at 11 Madison Avenue, 24th Floor, New York, NY 10010.  During the Class Period, Citigroup was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury

---

[7] *Id.*
[8] *Id.*

Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[9]

19.     Defendant Daiwa Capital Markets America Inc. ("Daiwa") is a New York corporation with its principal place of business located at Financial Square, 32 Old Slip, New York, NY 10005-3538.  During the Class Period, Daiwa was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[10]

20.     Defendant Deutsche Bank Securities Inc. ("Deutsche") is a Delaware corporation with its principal place of business located at 60 Wall Street, 4th Floor, New York, NY 10005. During the Class Period, Daiwa was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[11]

21.     Defendant Goldman, Sachs & Co., Inc. ("Goldman") is a New York corporation with its principal place of business located at 200 West Street, 29th Floor, New York, NY 10282. During the Class Period, Goldman was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[12]

22.     Defendant HSBC Securities (USA) Inc. ("HSBC") is a Delaware corporation with its principal place of business located at HSBC Tower, 452 Fifth Avenue, New York, NY 10018.

_____

[9] Id.
[10] Id.
[11] Id.
[12] Id.

During the Class Period, HSBC was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[13]

23.     Defendant Jefferies LLC ("Jefferies") is a Delaware limited liability company with its principal place of business located at 520 Madison Avenue, 10th Floor, New York, NY 10022.  During the Class Period, Jeffries was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[14]

24.     Defendant J.P. Morgan Securities LLC is a Delaware limited liability company with its principal place of business located at 277 Park Avenue, New York, NY 10172.  During the Class Period, Jeffries was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[15]

25.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a Delaware corporation with its principal place of business located at One Bryant Park, New York, NY 10036.  During the Class Period, Merrill Lynch was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[16]

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

26.     Defendant Mizuho Securities USA Inc. ("Mizuho") is a Delaware corporation with its principal place of business located at 320 Park Avenue, 12th Floor, New York, NY 10022.  During the Class Period, Mizuho was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[17]

27.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a Delaware limited liability company with its principal place of business located at 1585 Broadway, New York, NY 10036.  During the Class Period, Morgan Stanley was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[18]

28.     Defendant Nomura Securities International, Inc. ("Nomura") is a New York corporation with its principal place of business located at Worldwide Plaza, 309 West 49th Street, New York, NY 10019-7316.  During the Class Period, Nomura was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based financial instruments with Plaintiffs and/or members of the Class.[19]

29.     Defendant RBC Capital Markets, LLC ("RBC") is a Minnesota limited liability company with its principal place of business located at Three World Financial Center, 200 Vesey Street, 5th Floor, New York, NY 10281.  During the Class Period, RBC was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in

---

[17] *Id.*
[18] *Id.*
[19] *Id.*

U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[20]

30.     Defendant RBS Securities Inc. ("RBS") is a Delaware corporation with its principal place of business located at 600 Washington Boulevard, Stamford, CT 06901.  During the Class Period, RBS was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[21]

31.     Defendant SG Americas Securities, LLC ("SG") is a Delaware limited liability company with its principal place of business located at 1221 Avenue of the Americas, 6th Floor, New York, NY 10020.  During the Class Period, SG was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[22]

32.     Defendant TD Securities (USA) LLC ("TD") is a Delaware limited liability company with its principal place of business located at 31 West 52nd Street, New York, NY 10019.  During the Class Period, TD was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[23]

33.     Defendant UBS Securities LLC ("UBS") is a Delaware limited liability company with its principal place of business located at 1285 Avenue of the Americas, New York, NY

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*

10019.   During the Class Period, UBS was a registered Primary Dealer of U.S. Treasury Securities with the Federal Reserve Bank of New York and transacted in U.S. Treasury Securities and/or U.S. Treasury Securities-based financial instruments with Plaintiffs and/or members of the Class.[24]

## IV.   CLASS ALLEGATIONS

34.   Plaintiff, on behalf of itself and all other similarly situated direct purchaser plaintiffs, seeks damages, measured as overcharges, trebled, against Defendant based on allegations of anticompetitive and manipulative conduct in the Treasuries markets.

35.    Plaintiff brings this action on behalf of itself and, under Fed. R. Civ. P. 23(a) and (b)(3), as a representative of a class of direct purchasers (the "Class" or "Direct Purchaser Class") defined as follows:

> **All persons who, or entities which, purchased directly from a Defendant either a Treasury in the Auction's when-issued market or a related Treasury-Predicated Instrument at any time during the period from January 1, 2007 through and until the effects of Defendants' unlawful conduct cease (the "Class Period").**
>
> **Excluded from the Direct Purchaser Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.**

36.   The Class Members are so numerous and geographically dispersed that joinder of all members is impracticable that joinder of all Class Members is impracticable.

37.   Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members.   Among the questions of law and fact common to Class Members, many of which cannot be seriously disputed, are the following:

---

[24] *Id.*

- Whether Defendants engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize the prices for Secondary When-Issued Treasuries and/or related Treasury Instruments;

- Whether Defendants' contract, combination, or conspiracy to fix, raise, maintain or stabilize the prices for Secondary When-Issued Treasuries and/or related Treasury Instruments;

- Whether Defendants' conduct caused the prices for Secondary When-Issued Treasuries and/or related Treasury Instruments be set at artificially high and supra-competitive levels;

- Whether Defendants' conduct injured Plaintiff and other Class Members; and

- The appropriate measure of aggregated damages sustained by Class Members.

38.     Plaintiffs' claims are typical of the claims of the other Class Members.  Plaintiffs and the members of the Class have all sustained damage in that, during the Class Period, they transacted in Treasury Instruments at artificially maintained, non-competitive prices, established by the Defendants' actions in connection with the violations alleged herein.

39.     Plaintiff will fairly and adequately protect the interests of Class Members and have retained counsel competent and experienced in class action, antitrust and Commodities Exchange Act litigation.  Plaintiffs' interests are coincident with, and not antagonistic to, the interests of the other Class members.

40.     Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

41.     Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members.

42.     A class action is superior to any other method for the fair and efficient adjudication of these issues, as joinder of all members is impracticable.  The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation,

and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## V.   FACTUAL ALLEGATIONS

### A.   Treasuries Constitute a Worldwide Financial Benchmark and Are Critical to the Fed's Implementation of U.S. Monetary Policy.

43.   The U.S. Treasuries market – which is approximately a $12.7 trillion market – is the world's most liquid government securities market.  It is the primary means by which the U.S. government finances itself and manages its debt-load, which is the largest in the world (presently over $18.1 trillion according to the U.S. Treasury's Bureau of Fiscal Service).

44.   The purchase and sale of Treasury securities also offers a risk-free benchmark for other financial instruments in the private market and it allows market participants, on a broad scale, to transfer interest rate risk.

45.   To operate in this market, the U.S. Treasury sells bills, notes, bonds, Floating Rate Notes (FRNs), and Treasury Inflation-Protected Securities (TIPS) to institutional and individual investors through public auctions. Treasury auctions occur regularly on a set schedule. There are three steps to these auctions: announcement of the auction, bidding, and issuance of the purchased securities.

### 1.   Announcement of the auction.

46.   The U.S. Treasury uses an auction process to sell marketable securities. Some auctions are held weekly (*e.g.*, Treasury Bill auctions), some auctions are announced just few business days before they are held (*e.g.*, Treasury Notes auctions); some auctions are announced to take place on certain weeks in specific months (e.g. Treasury Bond auctions, TIPS auctions, and FRN auctions). These various treasury securities offer different maturity periods: for instance, Treasury Bills all mature within one year or sooner, Treasury Notes typically range in

maturity periods of two to ten years, Treasury Bonds offer a 30-year maturity period, and TIPS typically have maturity periods of five, ten, or thirty years.

### 2.    Bidding.

47.    There are two methods of bidding: competitive and non-competitive. A competitive bidder specifies the rate, yield, or discount margin that will accept.   A non-competitive bidder, by contrast, agrees to accept the rate, yield, or discount margin determined at auction.

48.    At the close of the Treasury auction, the U.S. Treasury awards all non-competitive bids that comply with the auction rules and then, for any remaining securities that were auctioned,  the Treasury accepts competitive bids in ascending order of their rate, yield, or discount margin (lowest to highest) until all securities have been awarded.

### 3.    Issuance.

49.    Treasury, after the Auction and the winners have been determined, then delivers the securities to those winning bidders. Some of the securities, such as bonds and TIPS, are issued with a stated interest rate applied to that security's par amount and pay out semi-annual interest payments. Other securities, such as Treasury Bills, are issued at a discount rate and then are paid out at their par rate at the time of maturity.

### 4.    Buying and Selling That Takes Place Around the Auction

50.    When the date of an auction becomes publicly known, a process of "when-issued" trading commences and then continues through to the time the Treasury Auction price is set and the Treasuries subsequently issued. When-issued trading is essentially the trading of forward contracts; these contracts ensure the delivery of a certain quantity and type of Treasuries to the contract purchaser which are delivered after "issuance" by the U.S. Treasury.

51.     Primary Dealers typically use the when-issued trading market to sell Treasuries to investors, clients, and other traders.  Such sales place Primary Dealers in a "short" position in the market, meaning that for the Primary Dealers to profit, the price they have agreed to sell in the when-issued market must exceed the price they pay for these same Treasuries in the Auction.  To compensate for the risk Primary Dealers face in being put in this short position, the Treasury Department auctions the Treasuries to the Primary Dealers at a discount.

52.     The when-issued market effectively aggregates the diverse information held by Primary Dealers and their counterparties. This aggregation presents the potential for market compromising risks, such as exposing the aggregate demand for the to-be auctioned Treasuries, which, unless properly controlled, can result in price-fixing and other market manipulation of the Treasuries' auction price.  Indeed, when-issued trading of notes and bonds prior to the close of bidding has been outlawed several times; it was first effectively prohibited from 1941 to 1975 and then again from 1977 to 1981.[25]

**B.      Primary Dealers Are Entrusted to Help Assist the Fed Implement U.S. Monetary Policy and Are Thus Obligated to Adhere to the Highest Ethical Standards at Each and Every Stage of the When-Issued Treasury Auction Process.**

53.     "[F]irst and foremost" Primary Dealers serve as "counterparties" to the Fed "in its implementation of monetary policy" through "execution of open market operations."[26]  As such, Primary Dealers are expected to "act as responsible counterparties and market participants in

---

[25] In early 1975, the Treasury removed the restriction on pre-auction when-issued trading in notes and bonds in the course of revising its offering circulars to eliminate "obsolete" provisions. However, the Treasury re-imposed the restriction in July 1977, "after monitoring the development and expansion of trading in Treasury securities prior to the actual auctions, and in some cases, prior even to the announcement of an offering" and after concluding that when-issued trading "does not contribute to the efficient marketing of new . . . issues and may, in fact, facilitate undesirable speculative activity in Treasury securities." Kenneth D. Garbade, The Institutionalization of Treasury Note and Bond Auctions, 1970-75, FRBNY Economic Policy Review (May 2004) (citing Federal Reserve Bank of New York Circular no. 8147, July 15, 1977). The ban was again removed in 1981 after the dealer community advocated that pre-auction when-issued trading could facilitate price discovery and new-issue distribution.

[26] Fed. Res. Bank of N.Y., *Operating Policy: Administration of Relationships with Primary Dealers* (Jan. 11, 2010), http://www.newyorkfed.org/markets/pridealers_policies.html.

their overall conduct and support of market efficiency and liquidity" and otherwise adhere to the highest ethical standards at each and every stage of the when-issued Treasury Auction process.[27]

54.     As a minimum prerequisite, the Fed "expects" Primary Dealers in the Treasuries Markets "to have [already] implemented" the Fed's "Best Practices" guidelines.[28]  These Best Practices "affirm existing notions of good market conduct," including "integrity, honesty, good faith, and mutual trust," and stress "the importance of maintaining the integrity and efficiency" of the Treasuries markets with "transparency" in order to "help maintain vigorous competition" and "promote trading integrity."[29]  The Fed's Best Practices make clear that Primary Dealers are obligated to

- "follow[] all applicable laws at all times"

- "avoid illegal activities such as price manipulation"

- "avoid pricing practices that . . . result in market distortions"

- "avoid conduct that deliberately seeks to evade regulatory reporting requirements or impedes market transparency efforts"

- "maintain a strong internal control environment sufficient to ensure that each of its business areas acts in accordance with applicable law and best market practices . . . including [through use of] appropriate information barriers"

55.     Even the appearance of impropriety is prohibited.  Special "care should be taken to ensure that otherwise permissible activities do not mask or promote actions that are or could be interpreted as anticompetitive."[30]   Price-fixing, price-sharing, boycott, and allocation

---

[27] *Id.*
[28] *Id.*
[29] Treasury Market Practices Group ("TMPG"), *Best Practices for Treasury, Agency Debt, and Agency Mortgage-Backed Securities Markets* (Sept. 14, 2010), http://www.ny.frb.org/tmpg/bestpractice_09142010.pdf.
[30] TMPG, *Antitrust Guidelines for the Members of the Treasury Market Practices Group and Associated Working Groups* (Jan. 15, 2014), http://www.newyorkfed.org/tmpg/tmpg_antitrust_guidelines_01152014.pdf.

agreements are strictly prohibited, and with respect to information sharing among Primary Dealers generally, "no discussion should have as its purpose encouraging uniform action or eliminating competition."

### C. The Critical Role Primary Dealers Play in Treasuries Price-Setting

56. There are essentially two types of bidders involved in the Treasuries Auction process: direct bidders and indirect bidders. The overwhelming majority of an Auction's direct bids originate from the Primary Dealers. These Primary Dealers are a specified set of pre-cleared financial institutions (currently 22, each one a Defendant in this action) authorized to trade directly with the Federal Reserve Bank of New York (which handles the U.S. Treasury's debt auctions). Indirect bidders, including foreign and international monetary authorities, acquire Treasuries through direct bidders and most frequently through a Primary Dealer. The vast majority of institutional and individual investors purchase Treasuries via one of the Primary Dealers or their affiliates in the secondary market. Thus, Primary Dealers are responsible for purchasing the overwhelming majority of Treasury securities issued by the U.S. Treasury.[31]

57. Therefore, and critically, Primary Dealers (*i.e.*, Defendants) act as "middlemen" (or market makers) between the U.S. government and traders/investors of U.S. treasuries, which is a worldwide market in the trillions of dollars. (For instance, in 2014, $7 trillion of U.S. Treasury securities were issued).

### D. Defendants Abused Their Position as Primary Dealers By Conspiring to Fix and Otherwise Manipulate the Price of Treasuries Defendants Sold in the When-Issued Market.

---

[31] Indeed, a five-agency Joint Staff Report made public on July 13, 2015 reports that, as recently as October, the Treasuries cash market remained "highly concentrated in the most active firms" with the ten "most active PTFs [principle trading firms]" accounting "for more than 90 percent of the trading activity of all PTFs" and the ten most active-bank dealers" accounting "for nearly 80 percent of the trading activity of all banks. *Joint Staff Report: The U.S. Treasury Market on October 15, 2014* (July 13, 2015), http://www.treasury.gov/press-center/press-releases/Documents/Joint_Staff_Report_Treasury_10-15-2015.pdf.

58.     The Treasuries market is under-regulated and is vulnerable to collusion among Primary Dealers.  Iindeed, Primary Dealers shared their proprietary clients' information with one another to coordinate their positions as sellers in the when-issued market (so as to inflate the price of the Treasuries there) and as bidders in the Treasuries auction (so as to then depress the price of those same Treasuries).

59.     While the Treasury Department has rules, and the Federal Reserve Bank of New York audits the auctions, neither of these bodies has enforcement powers. Other federal agencies have oversight powers but there is no cohesive regulatory oversight in this market. Primary Dealers have taken advantage of this regulatory gap in regulatory oversight to share proprietary client positions and related information with supposed competitor Primary Dealers.

60.     As Bloomberg News reported last month, guidelines at banks that prohibit the sharing of client's pre-auction yield size and bids are not always followed, and that the banks' policies proscribing the sharing of this information is not monitored or enforced.   The Bloomberg article specifically discusses that, through its investigation, it has learned that BNP Paribas SA and Cantor Fitzgerald, do not have "a consistent understanding among traders and salespeople about whether they can share information about orders before auctions[.]" Cantor Fitzgerald "operates on an honor system," according to one insider who the journalists reported on. The reporters further reveal that at Societé Generale, SA, (the parent company of Defendant SG Americas Securities, LLC) "traders can get a pre-auction rundown of customers' level of interest[.]"[32]

61.     The ability and temptation to manipulate the market, and cheat the antitrust laws, is difficult to deny. As Duke University Professor of Corporate and Securities law, James Cox

---

[32] Alecandra Scaggs, Daniel Kruger, and Keri Geiger, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk Is a Good Place to Start*, Bloomberg (June 24, 2015), http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes-treasuries.

was quoted: "In the Treasury market, where you have a small number of participants and the sales volume is very high, it is a fertile area for harmful collusive behavior[.]"[33] Indeed, the U.S. Department of Justice's Antitrust Division's ongoing investigation into the Treasuries market grew, it is reported, "out of cases in which prosecutors established that traders were trying to manipulate interbank interest rates and align foreign-exchange trades." In those cases, which have already reached guilty pleas for some of the parent corporations of certain Primary Dealer-Defendants here, including JPMorgan Chase & Co., Citigroup Inc., Royal Bank of Scotland Group Plc, Barclays Plc and UBS Group AG, Prosecutors claimed that traders engaged in cartel-like behavior by sharing information, such as via chatrooms."[34] The full extent of the collusion is not yet known, as it is presently fully within the province of Defendants.

## VI.    FRAUDULENT CONCEALMENT

62.    Defendants engaged in a successful, unlawful price-fixing conspiracy which, by its very nature, was inherently self-concealing.

63.    Defendants used non-public methods of communication, such as private chatrooms and text messages, to conceal their agreements to manipulate Treasury Instrument prices.

64.    Throughout the Class Period, Plaintiff regularly monitored his investments and conducted due diligence to try to avoid being harmed by financial misconduct. Practically speaking, there were limits to what could be done, given that so much of the Treasury Instrument market was shrouded in secrecy due to Defendants' conduct.

---

[33] Alecandra Scaggs, Daniel Kruger, and Keri Geiger, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk Is a Good Place to Start*, Bloomberg (June 24, 2015), http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes-treasuries.
[34] Alecandra Scaggs, Daniel Kruger, and Keri Geiger, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk Is a Good Place to Start*, Bloomberg (June 24, 2015), http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes-treasuries.

65.     Further, reasonable due diligence could not have uncovered Defendants' conspiracy because: (1) Defendants' trades and trading strategies are not public information; (2) the highly specialized and esoteric nature of the different aspects of the Treasury Instruments market makes it virtually impossible for an ordinary person to detect misconduct; and (3) neither Defendants nor their co-conspirators told Plaintiff or other Class Members that they were conspiring to manipulate the prices of Treasury Instruments.

66.     As a result, until recently neither Plaintiff nor the Class members had knowledge of any of the foregoing violations, and neither Plaintiff nor the Class Members, until recently, could have discovered through reasonable diligence that Defendants and their co-conspirators had engaged in the foregoing violations, since Defendants and their co-conspirators actively and fraudulently concealed these violations to obscure their illegal activity.

67.     Defendants and their co-conspirators wrongfully concealed and carried out their illegal conduct in a manner that was designed to and did preclude detection.

68.     Defendants and their co-conspirators' fraudulent concealment tolled the statute of limitations applicable to Plaintiff's and the Class Members' claims.

## VII.   CLAIMS FOR RELIEF

### COUNT ONE:
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### 15 U.S.C. § 1, et seq.

69.     Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

70.     Defendants are direct, horizontal competitors, and engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. Section 1.

71.     The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Defendants, the substantial terms of which were to illegally fix, raise, reduce, maintain, or stabilize the prices at which Treasury Instruments were bought and sold during the Class Period.

72.     All of the Defendants have knowingly participated in, the conspiracy alleged herein.

73.     Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators.  These other co-conspirators have either acted willingly or, due to coercion, unwillingly, in furtherance of the unlawful restraint of trade alleged herein.

74.     Defendants' conspiracy is a *per se* violation of the Sherman Act and is an unreasonable and unlawful restraint of trade.

75.     Defendants' conspiracy, and the resulting impact on the prices of Treasury Instruments, occurred in and affected interstate commerce.

76.     The contract, combination, or conspiracy had anticompetitive effects, as alleged herein.

77.     As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, Class Members have suffered injury to their business or property.

78.     The injury to Plaintiff and other Class Members are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

79.     Plaintiffs are entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violation of the Sherman Act alleged herein.

**COUNT TWO:**
**MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT**
**7 U.S.C. § 1, et seq.**

80.     Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

81.     By their intentional misconduct, Defendants and their co-conspirators each violated Sections 6(c)(3) and 9(a)(2) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 9(3), 13(a)(2), and CFTC Rule 180.2, and manipulated the prices of Treasury Instruments, causing these prices to be artificial during the Class Period.

82.     Defendants knew that their wrongful acts would cause prices to be artificial during the Class Period.

83.     Defendants intended that their wrongful acts would result in prices being artificial during the Class Period.

84.     Defendants' and their co-conspirators' trading and other activities alleged herein constitute market manipulation of prices of Treasury Instruments, in violation of Sections 6(c)(3), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9(3), 13(a) and 25(a), and Rule 180.2.

85.     Defendants' and their co-conspirators' manipulation deprived Plaintiff and the Class Members of a lawfully operating market during the Class Period.

86.     Plaintiff and others who transacted in Treasury Instruments during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulations in violation of the CEA, 7 U.S.C. § 1, et seq., and Rule 180.2. As a direct result of the artificial and unlawful prices, Plaintiff and Class Members were injured and suffered damages.

**COUNT THREE:**
**EMPLOYMENT OF MANIPULATIVE OR DECEPTIVE DEVICE OR CONTRIVANCE**
**IN VIOLATION OF THE COMMODITY EXCHANGE ACT, INCLUDING CFTC RULE**
**180.1**
**7 U.S.C. § 1, *et seq.***

87.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

88.    By their intentional misconduct during the Class Period, Defendants and their co-conspirators each violated Sections 6(c)(1) and 9(a)(2) of the CEA, 7 U.S.C. §§ 9(1), 13(a)(2), and CFTC Rule 180.1, and caused prices of Treasury Instruments to be artificial during the Class Period.

89.    Defendants' and their co-conspirators' trading and other activities alleged herein constitute market manipulation of prices of Treasury Instruments, in violation of Sections 6(c)(1), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9(1), 13(a) and 25(a), and Rule 180.1.

90.    Defendants knew that their wrongful acts would cause prices to be artificial during the Class Period.

91.    Defendants intended that their wrongful acts would result in prices being artificial during the Class Period.

92.    Defendants' and their co-conspirators' manipulation deprived Plaintiff and Class Members of a lawfully operating market during the Class Period.

93.    Plaintiff and others who transacted in Treasury Instruments during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulations in violation of the CEA, 7 U.S.C. § 1, et seq., and Rule 180.1. As a direct result of the artificial and unlawful prices, Plaintiff and Class Members were injured and suffered damages.

## COUNT FOUR:
## PRINCIPAL-AGENT LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT
## 7 U.S.C. § 1, *et seq.*

94.     Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

95.     Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

96.     Plaintiff and Class Members are each entitled to actual damages sustained in Treasury Instruments for the violations of the CEA alleged herein.

## COUNT FIVE:
## AIDING AND ABETTING MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT
## 7 U.S.C. § 1, *et seq.*

97.     Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

98.     Defendants and their co-conspirators knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's, and their co-conspirators', Treasury Instrument manipulations, and willfully intended to assist these manipulations, which resulted in Treasury Instruments pricing becoming artificial during the Class Period in violation of Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a), 25(a)(1).

99.     Plaintiff and Class Members are each entitled to actual damages sustained in Treasury Instruments for the violations of the CEA alleged herein.

## VIII.   PRAYER FOR RELIEF

100.     WHEREFORE, Plaintiff, on behalf of itself and the Class, prays that the Court:

101.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the class, and declare Plaintiff as a named representative of the Class;

102.    Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and defenses;

103.    Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

104.    Award the Class damages (*i.e.*, three times overcharges) in an amount to be determined at trial, plus interest in accordance with law;

105.    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

106.    Award such further and additional relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, as the Court may deem just and proper under the circumstances.

## IX.    JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed class, demands a trial by jury on all issues so triable.

Dated: July 24, 2015

Respectfully submitted,

**NUSSBAUM LAW GROUP, P.C.**

By: *_/s/ Linda P. Nussbaum_*

25

Linda P. Nussbaum (LN-9336)
570 Lexington Avenue, 19 Floor
New York, NY 10022
(212) 722-7053
lnussbaum@nussbaumpc.com

Michael E. Criden
**CRIDEN & LOVE, P.A.**
7301 S.W. 57th Court, Suite 515
South Miami, Florida 33143
Telephone:  (305) 357-9000
Fax:  (305) 357-9050
mcriden@cridenlove.com

Scott P. Schlesinger
**SCHLESINGER LAW OFFICES, P.A.**
1212 Southeast Third Avenue
Fort Lauderdale, FL 33316
Telephone: (954) 320-9507
Fax: (954) 320-9509
scott@schlesingerlaw.com

*Counsel for Plaintiff Marc G. Federighi and the Proposed Class*